UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CONNECTICUT INDEPENDENT UTILITY WORKERS LOCAL 12924, *et al.*, Plaintiffs, v. CONNETICUT NATURAL GAS CORPORATION, UIL HOLDINGS CORPORATION, *et al.*, Defendants. | Civil No. 3:12cv961 (JBA) June 14, 2013 |

**RULING ON DEFENDANTS' MOTION TO DISMISS**

On November 21, 2012, Plaintiffs Connecticut Utility Workers Local 12924, Robert Eubanks, Emmerich Fellinger, Mark Whelden, and Martin Ritter (hereinafter collectively, "the Union"), and Ronald Holmes, Rollin Cowels, Roosevelt Bright, Francis Csekovsky, Robert Messenger, Peter Moschetto, Joan Polzun, and Carl Schaeffer (hereinafter collectively, "the Plaintiff Retirees") filed a Second Amended Verified Complaint [Doc. # 35] against Defendants Connecticut Natural Corporation ("CNG"), UIL Holdings Corporation ("UIL"), UIL Benefits Administration Committee, Angel Bruno, Steven Favuzza, William Manniel, Diane Pivirotto, Joseph Thomas, Patricia Cosgel, Christopher Malone, Richard Nasman, and John Prete (hereinafter collectively "the Benefits Administration Committee"), UIL Holdings Corporation Retiree Health Plan for Selected Employees, UIL Holdings Corporation Cafeteria Plan for Selected Employees—Plan No. 531, and UIL Holdings Corporation Employee Health Plan—Plan No. 532, alleging violations of the Labor–Management Relations Act, 29 U.S.C. § 185 ("LMRA") and the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3) ("ERISA").  Defendants now move [Doc. # 37] pursuant to

Federal Rule of Civil Procedure 12(b)(6) to dismiss all of Plaintiffs' claims.  For the following reasons, Defendants' motion to dismiss is granted in part and denied in part.

## I.      Background

In 1991, CNG and the Union entered into a Collective Bargaining Agreement ("CBA"), which set the maximum payments CNG would make toward retiree major medical insurance premiums.  (2d Am. Compl. [Doc. # 35] ¶ 46.)  In 1994, CNG and the Union renewed this agreement via a letter (the "Contract") memorializing the parties' understanding regarding the maximum premium payments:

> In 1991, [CNG] and the Union negotiated a reduction of the lifetime maximum from $1,000,000 to $250,000 on major medical, and also set [CNG] maximum premium payments for retirees.   [CNG] made the following commitment; which we renew by this letter:  If any employee's balance in his/her major medical maximum reaches a balance of $250,000, and the premiums for medical insurance reach a level of $375 for single or $750 for family coverage, the Company will hold discussions with the Union for the purposes of reviewing both the lifetime maximum and the premium sharing.

(Contract, Ex. 1-A to 2d Am. Compl.; 2d Am. Compl. ¶ 47.)  At first, CNG, UIL, and the Benefits Administration Committee made the premium calculations as agreed to by the parties, but at some point in time after the Contract was signed, CNG, UIL, and the Benefits Administration Committee unilaterally changed the method of calculating the maximum premium payments for retiree medical insurance policies, by reducing the maximum premium payments or the 'cap' applied to various medical insurance policies by varying percentages, such that the maximum premium payments made by CNG are reduced and the amount of the premium that retirees must pay is increased.  (2d Am. Compl. ¶¶ 49–50, 52.)  Defendants also unilaterally blended the dependent caps for

retiree health benefit plans (*id.* ¶ 69), though Plaintiffs were not notified of this change until April 1, 2012 (*id.* ¶ 53).

CNG, UIL, and the Benefits Administration Committee formerly calculated premium payments for retired and active employees separately, but at some point in time, Defendants began pooling the two groups of employees together for the purpose of calculating premium payments.  (*Id.* ¶ 76.)  Plaintiffs first learned of this change in practice on April 1, 2012.  (*Id.*)  Since that time, Defendants have separated retired and active employees into two pools, but continue to charge both groups the single pooled rate, thereby increasing the premiums of active employees.  (*Id.* ¶¶ 77–78.)  As a result of the changes, on May 4, 2012, June 7, 2012, and August 3, 2012, Plaintiffs submitted ERISA document disclosure requests to the CNG Benefits Administrator, seeking the most recent and previous summary plan descriptions, prior bargaining agreements, and other instruments under which the benefits plans are operated.  (*Id.* ¶ 83.)  Defendants replied to these requests by letter on June 1, 2012, and June 20, 2012, but have not provided full responses to each of Plaintiffs' request for documents and clarification.  (*Id.* ¶ 84.)

## II.    Discussion[1]

As a preliminary matter, Defendants have attached copies of the 1994 CBA and the correspondence related to Plaintiffs' ERISA document requests to their motion to dismiss, and argue that the Court should consider these documents in ruling on the motion.  The Second Circuit has recognized that "when a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding into one for summary judgment."  *Int'l Audiotext Network, Inc. v. American Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1992).   "Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).   "However, 'even if a document is "integral" to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document.  It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document.'"  *Id.* (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)).

---

[1] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although detailed allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Conclusory allegations are not sufficient. *Id.* at 678–79; *see also* Fed. R. Civ. P. 12(b)(6).

Plaintiffs object to the Court's consideration of these documents at this stage in the litigation, arguing that they did not incorporate by reference or rely on the CBA and the correspondence in the Second Amended Verified Complaint, and that they therefore should not be considered until after discovery has concluded. Though Plaintiffs make general reference to a CBA in the Second Amended Verified Complaint (*see* 2d Am. Compl. ¶ 46), at oral argument Plaintiffs' counsel clarified that any such mention refers to the 1994 letter and not to the CBA submitted by Defendants. Thus, the Court will not consider the CBA in ruling on the pending motion. However, the Second Amended Verified Complaint does make reference to the ERISA document request correspondence. (*See id.* ¶¶ 83–84.) Therefore, the Court will deem these documents to have been incorporated by reference into the Second Amended Verified Complaint. *See DiFolco*, 622 F.3d at 112 ("Because DiFolco referred in her complaint to her e–mails to Kaplan of August 23, 2005, and August 24, 2005, the District Court could deem them incorporated in the complaint and therefore subject to consideration in its review of the adequacy of the complaint.").

## A. Standing

Defendants argue that Plaintiffs lack standing to bring Counts One and Two, which allege breach of contract pursuant to § 301 of the LMRA, because they did not retire while the CBA was in force. Plaintiffs do not dispute that in order for a party to demonstrate standing to sue under a collective bargaining agreement, it must be established that he or she was a party to the collective bargaining agreement during the term of the contract. *See American Fed'n Grain Millers, AFL–CIO v. Int'l Multifoods Corp.*, 116 F.3d 976, 979–80 (2d Cir. 1997). However, Plaintiffs argue that the operative agreement in this dispute is the Contract, and contest Defendants' description of that

agreement as a "side letter" to the CBA.  Plaintiffs assert that the Contract is an independent agreement that is still in force and constitutes a collective bargaining agreement.  *See Black's Law Dictionary* (9th ed. 2009) (a "collective–bargaining agreement" is "[a] contract between an employer and a labor union regulating employment conditions, wages, benefits, and grievances").

The terms of the Contract, while referencing the 1991 CBA negotiations ("In 1991, the Company and the Union negotiated a reduction of the lifetime maximum from $1,000,000 to $250,000 on major medical, and also set Company maximum premium payments for retirees."), do not specifically state that the letter is meant to be incorporated into the CBA.  Defendants argue that because the Contract purports to "renew" the 1991 commitment to hold discussions with the Union, and because the letter was sent within a month of the expiration of the 1991–1994 CBA, the Contract must be a side letter to the 1994 CBA.  While the term "renew" does suggest that the 1991 agreement would have expired absent the Contract, it is not clear from the four corners of the Contract that the previous 1991 agreement was a part of the 1991–1994 CBA, or that the renewal of the promise to hold discussions with the Union was linked to the renewal of the CBA in 1994.  To consider the temporal relationship between the Contract and the renewal of the CBA would entail a consideration of extrinsic evidence, which is an analysis that is more appropriately undertaken after the parties have had the opportunity to develop the record.

Furthermore, assuming that the Contract was intended to create an agreement independent of the CBA, there is no clear language in the letter that would suggest an expiration date of the agreement.  The only temporal language in the Contract is that CNG agrees to hold discussions with the Union "[i]f any employee's balance in his/her

6

major medical maximum reaches a balance of $250,000, and the premiums for medical insurance reach a level of $375 for single or $750 for family coverage."  While this language describes when CNG's obligations under the Contract could be triggered, and when a breach might occur, it does not by its plain terms indicate a specific date as a temporal limitation on CNG's duty to hold discussions with the Union.  Therefore, based on the information currently before the Court, Plaintiffs have alleged sufficient facts to show that there was an unexpired contract under which they retired, and thus have standing to bring Counts One and Two.

### B.     Timeliness

Defendants also argue that Counts One and Two should be dismissed because they were filed after the statute of limitations expired.  "When a federal statute does not establish a period of limitations for actions brought to enforce it, the district court's task is to borrow the most suitable statute or other rule of timeliness from some other source. *Muto v. CBS Corp.*, 688 F.3d 53, 57 (2d Cir. 2012).  "Because Congress did not provide a statute of limitations for suits brought under § 301 [of the LMRA], this Court determines the statute of limitations for the federal cause of action by looking at the most appropriate state statute of limitations."  *Local 802, Assoc. Musicians v. Parker Meridien Hotel*, 145 F.3d 85, 87 (2d Cir. 1998).  Under Connecticut law, an action for breach of contract is subject to a six–year statute of limitations.  *See* Conn. Gen. Stat. § 52-576(a).  Defendants argue that because the CBA expired on November 30, 1997, the statute of limitations on any § 301 claim would have run by November 30, 2003, nearly nine years before this action was filed.  On its face, the Contract is not unambiguously linked to the expiration date of the CBA.  Therefore, for the purposes of this motion to dismiss, Plaintiffs have

alleged sufficient facts to show that the Contract is an independent agreement that is still in force.

Nonetheless, Defendants argue that even if the Contract represents an independent agreement, Plaintiffs' breach of contract claim would have accrued at the time of the alleged breach, rather than at the time Plaintiffs first became aware of this breach, as Plaintiffs contend in their opposition. [2]  (*See* Pls.' Opp'n [Doc. # 41] at 8–10.) Even if the Court were to conclude that Plaintiffs' cause of action accrued at the time of the breach, rather than at the time of discovery, there is nothing on the face of the Complaint or in the documents properly before the Court that establishes when Defendants first unilaterally changed the method for calculating premiums.  Thus, at this time, there are insufficient facts for the Court to determine when the Contract was first breached.  Because Defendants' "statute of limitations argument is an affirmative defense for which [they] bear[] the burden of proof," *United States v. Livecchi*, No. 09-1979-cv,

---

[2] "Even where a federal court borrows a state statute of limitations, federal law governs the question of when a federal claim accrues." *M.D. v. Southington Bd. Of Educ.*, 334 F.3d 217, 221 (2d Cir. 2003) (internal citations and quotation marks omitted). "Under federal law, a cause of action generally accrues when the plaintiff knows or has reason to know of the injury that is the basis of the action." *Id.* (internal citations and quotation marks omitted).  Defendants argue that in a contract action, the cause of action accrues at the time of breach, and not at the time of discovery, but the case they rely on in support of that proposition is a Second Circuit case applying New York law to state–law claims.  *See T&N PLC v. Fred S. James & Co. of New York, Inc.*, 29 F.3d 57 (2d Cir. 1994). Here, it would appear that Plaintiffs' cause of action accrued at the time they knew or should have known that Defendants had unilaterally changed the method for calculating the premium caps, which the Second Amended Verified Complaint alleges was on April 1, 2012.  Defendants argue that Plaintiffs must have been aware of the changed premium calculations before that date because they paid the enhanced premiums for years. However, this argument assumes facts not currently in the record at the motion to dismiss phase.

2013 WL 1296464, at *6 (2d Cir. Apr. 2, 2013), Defendants' motion to dismiss is denied on this ground.

### C.        Counts One Through Four

In Counts One through Four of the Second Amended Verified Complaint, Plaintiffs allege breach of contract in violation of § 301 of the LMRA (Counts One and Two), and violation of the Retiree Health Plan pursuant to § 502 of ERISA (Counts Three and Four).[3]  Defendants argue that each of these counts should be dismissed for failure to state a claim for which relief can be granted because Plaintiffs fail to show that they had a vested right in the set premium caps.

Defendants first argue that Plaintiffs cannot show that the maximum premium contribution amount was reduced within the plain meaning of the Contract and the plan. The Contract states that CNG and the Union had negotiated the "maximum premium payments for retirees," and the Employee Benefits Handbook explains that "[t]he cap represents the maximum amount the Company will contribute each year toward plan costs, even if costs rise. . . . All such retired participants will have financial responsibility for . . . any other applicable cost sharing (e.g. contributions, deductibles, coinsurance, copayments) that the individual may require.  That means that retirees' cost sharing may increase, while the Company's maximum contribution will remain fixed," (Employee Benefits Handbook, Ex. 3 to 2d Am. Compl. at 17.)  Defendants claim that by this language, they agreed only to pay *no more than* the amount of the cap, and that the cap represented merely a ceiling above which Defendants' contributions would not rise,

---

[3] At oral argument, Plaintiffs' counsel clarified that Plaintiffs allege four breaches: (1) Defendants imposed under-the-cap contributions, (2) Defendants increased Plaintiffs' premiums, (3) Defendants blended dependent caps, and (4) Defendants pooled active and retired employees without passing the savings along to plan members.

rather than a floor below which their contributions could not fall. Specifically, Defendants claim that the clear language of the plan explains that the plan participants remain obligated to pay additional "contributions" which could increase the premiums they are required to pay. Thus, Defendants argue, because they never agreed to pay the full amount of the cap, Defendants would fulfill their contractual obligations by paying any amount up to the cap, and therefore increasing Plaintiffs' "under–the–cap" contributions violated neither the Contract nor the plan.

In support of this argument, Defendants rely on case law interpreting the terms "maximum" and "cap" as a ceiling, rather than a floor, on the amount owed, and the term "contribution" as an employee's contribution to an insurance premium, rather than an out–of–pocket expense. *See Bauer v. Kraft Foods Global, Inc.*, No. 11-cv-15 (BBC), 2012 WL 3962907, at *3 (W.D. Wis. Aug. 7, 2012) ("[E]mployee 'contributions' in the insurance context are defined consistently as meaning the employee's contribution to the insurance premiums rather than any out of pocket expense." (citing *New York State Court Officers Ass'n v. Hite*, 851 F. Supp. 2d 575 (S.D.N.Y. 2012))). Plaintiffs do not dispute the general interpretations of these terms. Rather, Plaintiffs argue that the Contract sets out an implicit promise by CNG to pay all health insurance premiums up to the cap. Otherwise, Plaintiffs argue, CNG's promise to hold discussions with the Union if the premium payments reached the cap would be meaningless, because it could simply reduce its premium contribution to avoid ever triggering this obligation. Furthermore, Plaintiffs dispute Defendants' reading of the plan description. Plaintiffs argue that because the term "contribution" appears in a list with other out–of–pocket expenses, such as "deductibles" and "copayments," in this instance, the term should be interpreted to mean an additional out–of–pocket expense, rather than an additional premium payment.

Based on this reading, the plan would not make plan participants responsible for under–the–cap payments such as the ones imposed by Defendants.

Defendants also argue that Counts One through Four fail because Plaintiffs cannot establish that they had a vested right to a fixed premium payment under the plan. "Under ERISA, it is the general rule that an employee welfare benefit plan is not vested and that an employer has the right to terminate or unilaterally to amend the plan at any time." *Schonholz v. Long Island Jewish Med. Ctr*, 87 F.3d 72, 77 (2d Cir. 1996). *Cf. Grain Millers*, 116 F.3d at 979 ("The rule under section 301 is similar—after a CBA expires, an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to that CBA."). An employer's agreement to vest welfare benefits, however, binds that employer and will be enforced. *Id.*; *see also Devlin v. Empire Blue Cross & Blue Shield* (*Devlin II*), 274 F.3d 76, 82 (2d Cir. 2001) ("[E]ven though Empire is 'generally free' to modify its life insurance plan, if Empire promised vested benefits, those benefits will be enforced.") "If a plaintiff can point to ambiguous language that is reasonably susceptible to interpretation as a promise to vest, that plaintiff is entitled to get to a trial." *Peterson v. Windham Cmty. Mem'l Hosp., Inc.*, 803 F. Supp. 2d 96, 102 (D. Conn. 2011) (citing *Devlin II*, 274 F.3d at 83–85). Defendants argue that Plaintiffs fail to point to any such language in the plan, and that the reservation of rights clause is determinative of whether or not Plaintiffs' benefits vested under the plan.

The Employee Benefits Handbook states:

Although the Company intends to continue the plans described in this Benefit Handbook indefinitely, the Company reserve[s] the right to change or end a plan for any reason, at any time. Any change or amendment affecting union employees is, of course, subject to the terms and provisions of the collectively bargained agreement.

(Employee Benefits Handbook at 128; *see also id.* at 145.)   The Second Circuit has recognized that "if an employer has not promised vested benefits in a SPD, and the employer expressly reserves the right to terminate the plan in the SPD, benefits promised in the SPD are not vested." *Grain Millers*, 116 F.3d at 982.   "This is true even if the *same* plan document also contains language that could otherwise reasonably be construed as a promise to vest." *Argay v. Nat'l Grid USA Serv. Co.*, No. 11-3698-cv, 2012 WL 5860518, at *1 (2d Cir. Nov. 20, 2012) (citing *Abbruscato v. Empire Blue Cross & Blue Shield*, 274 F.3d 90, 94, 100 (2d Cir. 2001)).   Thus, Defendants focus on this language to argue that regardless of what Plaintiffs may point to in the plan documents or in the Contract, Plaintiffs' benefits could not have vested.

Plaintiffs contend, however, that because the reservation of rights clause is "subject to the terms and provisions of the collectively bargained agreement," and because the Contract creates an implicit promise by CNG to pay all premium costs up to the cap, they have alleged sufficient facts to withstand Defendants' motion to dismiss. Plaintiffs point to no case law that supports such a reading of the reservation of rights clause.   Furthermore, Plaintiffs' briefing does not identify specific language that could be reasonably interpreted as promising vested benefits.   The only language Plaintiffs point to is the renewed commitment in the Contract that

> [i]f any employee's balance in his/her major medical maximum reaches a balance of $250,000, and the premiums for medical insurance reach a level of $375 for single or $750 for family coverage, the Company will hold discussions with the Union for the purposes of reviewing both the lifetime maximum and the premium sharing.

Defendants argue that such language is easily distinguishable from language that has previously been interpreted as creating vested benefits.   For example, in *Devlin II*, the Second Circuit found that the plaintiffs had raised a genuine issue of material fact as to

12

whether a plan created vested benefits where it stated that "retired employees, after completion of twenty years of full–time permanent service and at least age 55 *will be insured.*"  *Devlin II*, 274 F.3d at 85 (emphasis in original).  The Contract does not contain any language similar to the "will be insured" phrase on which *Devlin II* relied.

Furthermore, Plaintiffs offer no case in which language similar to the language in the Contract was found to be reasonably susceptible to the interpretation that it created vested benefits.  The fact that the Contract contains no obvious time limitation on CNG's obligation to enter into discussions with the Union does not convert it into a promise for vested benefits:  "The fact that the plan could be read to promise benefits for an 'indefinite' period does not mean a promise of 'lifetime' benefits as a matter of law.  The absence of duration language in a plan document does not create a binding obligation to vest benefits."  *Adams v. Tetley USA, Inc.*, 363 F. Supp. 2d 94, 104 (D. Conn. 2005).  The Contract makes no mention of the continuation of benefits.  It contains only a promise to hold discussions[4] to review the premium caps if they are ever reached.  While this promise may assume that the plan will continue to exist, Defendants clearly reserved their rights to terminate or amend the plan in the plan documents.  Therefore, it does not appear that there is any language that could reasonably be interpreted as creating vested benefits.  The Court thus grants Defendants' motion to dismiss as to Counts One through Four.

---

[4] Defendants make much of Plaintiffs' conflation of the term "discussions" with the term "negotiations" in their briefing, but it appears that these terms can be used interchangeably.  *See Pertec Computer*, 284 N.L.R.B. 810, 817 (1987) ("I find that the term 'discuss' in the contract was not intended to connote a distinction other than the often understood meaning, to negotiate or bargain.")  At oral argument, Plaintiffs' counsel did not immediately identify the failure to hold discussions as one of the breaches alleged in the Second Amended Verified Complaint.  However, when pressed, he stated that Defendants breached the Contract by failing to negotiate.

### D.     Counts Five and Six

In Counts Five and Six of the Second Amended Verified Complaint, Plaintiffs allege that Defendants breached their fiduciary duty in violation of ERISA by changing the manner in which premium contributions were calculated.  (*See* 2d Am. Compl. ¶¶ 114–33.)   Defendants argue that these claims fail as a matter of law because the modification of an ERISA welfare benefits plan is not a fiduciary act.  The Supreme Court has stated that "[p]lan sponsors who alter the terms of a plan do not fall into the category of fiduciaries." *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996); *see also Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 443–44 (1999) ("In general, an employer's decision to amend a pension plan concerns the composition or design of the plan itself and does not implicate the employer's fiduciary duties which consist of such actions as the administration of the plan's assets.")  "[E]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt modify, or terminate welfare plans.  When employers undertake those actions, they do not act as fiduciaries." *Spink*, 517 U.S. at 890 (internal citations and quotation marks omitted).  Thus, where benefits are not vested, the imposition of or change in a benefits cap would not implicate fiduciary duties under a plan.  *See Blake v. H–2A and H–2B Voluntary Employees' Beneficiary Ass'n*, 952 F. Supp. 927, 936 (D. Conn. 1997) (holding that plan sponsors did not act as fiduciaries in amending the plan to include a benefits cap where benefits had not vested and the plan included an express reservation of rights to amend, modify, or terminate the plan).

Plaintiffs contend that the combined language of the plan and the Contract indicates that benefits had vested.  The Second Circuit has recognized that where benefits are vested, a reduction in benefits may constitute "a breach of contractual promise to vest

such benefits." *Devlin II*, 274 F.3d at 88.  In *Devlin II*, the Second Circuit reasoned that "[i]t therefore follows that Empire may have exercised discretionary authority with respect to the plan, and Empire's unilateral reduction in benefits and its communications about this reduction may have violated the plan documents and, in turn, ERISA § 404(a)(1)(D)."  *Id.*  However, the plan language in this case is distinguishable from the language at issue in *Devlin II*, and could not be interpreted as promising vested benefits. Because Plaintiffs benefits were not vested, Defendants' actions in changing the method of calculating the premium contribution did not implicate their fiduciary duties under ERISA.  *See Adams*, 363 F. Supp. 2d at 108 (citing *Devlin II*, 274 F.3d at 88).  The Court therefore grants Defendants' motion to dismiss Counts Five and Six.

### E.    Counts Seven and Eight

In Counts Seven and Eight, Plaintiffs allege that Defendants breached their fiduciary duty in failing to notify Plaintiffs of a material modification to the plan.  (*See* 2d Am. Compl. ¶¶ 134–53.)  Defendants argue that these claims should be dismissed because the calculation examples and SPD provided to Plaintiffs (*see* Exs. 2 and 3 to 2d Am. Compl.) were sufficient to inform Plaintiffs of the cost sharing features of the plan. However, Defendants do not cite to any language in the plan documents that notified Plaintiffs of a change in the premium calculation, even if the new calculation was described in those documents. The documents also do not appear to give any indication that Defendants had blended the active and retired employee premiums.  Plaintiffs have alleged that they received notice of these changes via alternate channels, and not from the plan documents.  Therefore, it appears that Plaintiffs have alleged sufficient facts to show that they received insufficient notice of the changes to the premium calculations.

Defendants also argue that even if the Court were to find that the information provided to plan participants was insufficient, Plaintiffs claims should be dismissed because they have not established "likely prejudice." "In order to maintain a breach of fiduciary duty claim based on failure to provide an SPD, a plaintiff must make a showing of 'likely prejudice,' meaning that he or she 'was likely to have been harmed' where no SPD has been distributed." *Peterson*, 803 F. Supp. 2d at 107 (quoting *Weinreb v. Hosp. for Joint Diseases Orthopaedic Inst.*, 404 F.3d 167, 171 (2d Cir. 2005)). Defendants argue that because they had the absolute right to amend, modify, or terminate the plan, Plaintiffs could not have been prejudiced by any lack of notice of the changes implemented by Defendants. However, Plaintiffs maintain that they can establish likely prejudice because Defendants' failure to notify them of the changes to the premium contributions robbed them of the opportunity to bargain regarding those changes, an opportunity they had arguably been promised as a part of the Contract. Because Plaintiffs have claimed that they lost the opportunity to bargain for a more favorable plan as a result of Defendants' failure to notify them of plan changes, they have alleged sufficient facts to establish likely prejudice and to state a claim for relief on Counts Seven and Eight. *Cf. Peterson*, 803 F. Supp. 2d at 107 ("By demonstrating that he forewent other job opportunities because he had not seen the SPDs and accordingly did not know that his retirement health benefits could be terminated, Peterson has demonstrated a genuine issue of material fact as to whether he was likely to have been harmed by the failure to provide SPDs." (internal citations and quotation marks omitted)). Defendants' motion to dismiss is therefore denied with respect to Counts Seven and Eight.

**F.      Counts Nine and Ten**

In Counts Nine and Ten of the Second Amended Verified Complaint, Plaintiffs allege ERISA promissory estoppel.  (*See* 2d Am. Compl. ¶¶ 154–73.)  To succeed on their promissory estoppel claims, Plaintiffs "must prove (1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced, and must adduce facts sufficient to satisfy an 'extraordinary circumstances' requirement as well." *Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 109 (2d Cir. 2008).  "In order to satisfy the 'extraordinary circumstance' requirement of ERISA estoppel, a plaintiff must demonstrate that the surrounding circumstances are beyond those required to satisfy the ordinary elements of estoppel; he or she must show that the employer used the promise to intentionally induce a particular behavior on plaintiff's part only to renege on that promise after inducing the sought after behavior." *Peterson*, 803 F. Supp. 2d at 105 (internal citations and quotation marks omitted).  Defendants argue that Counts Nine and Ten should be dismissed because Plaintiffs have established neither a promise to vest benefits nor "extraordinary circumstances" as a result of reliance on that promise.

Plaintiffs have not established that the terms of the plan documents or the Contract could be plausibly interpreted as promising vested benefits such that Defendants agreed to pay all expenses up to the premium cap in perpetuity.  Therefore, Plaintiffs cannot establish the first element of their ERISA estoppel claim.  *See id.* at 106 ("Without written language that can reasonably be interpreted as a promise to provide lifetime benefits, as discussed above, Peterson's estoppel claim must necessarily fail."); *Adams*, 363 F. Supp. 2d at 110 ("Plaintiffs' claim fails on the first element because they can point to no language in any SPD or any informal communication from Tetley that reasonably could

be construed as a promise of lifetime benefits.").   Therefore, Defendants' motion to dismiss Counts Nine and Ten is granted.

### G.   Count Eleven

In Count Eleven of the Second Amended Verified Complaint, Plaintiffs allege that Defendants breached their fiduciary duty by charging active employees excessive premiums.   (*See* 2d Am. Compl. ¶¶ 174–80.)   In support of their argument that Defendants' blending of the caps for active and retired employees constituted a breach of fiduciary duty, Plaintiffs rely on *Toussaint v. JJ Wesier & Co.*, No. 04 Civ. 2592 (MBM), 2005 WL 356834 (S.D.N.Y. Feb. 13, 2005), for the proposition that charging participants excessive premium payments would constitute a breach of fiduciary duty.   In *Toussaint*, the court addressed only whether the plaintiff had alleged sufficient facts to show that the defendants were fiduciaries in that they performed more than ministerial functions in administering the plan, and whether the plaintiff's claims sounded in fraud such that they would be subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b).   The specific issue of whether or not such an allegation could constitute a fiduciary breach was not before the court, but it appears from the ruling that the court assumed for the purposes of the opinion that charging excessive premiums could constitute a breach of fiduciary duty.   In response to these claims Defendants reiterate their arguments that amendments to the structure of a non–vested welfare benefit plan do not implicate ERISA's fiduciary duties.   However, a decision to charge excessive premiums could plausibly implicate the management of plan funds—in that the plan was collecting additional premiums for profit, rather than in the best interest of the plan participants— as opposed to a simple change in the structure of the plan, and therefore, accepting all facts in the Second Amended Verified Complaint as true, it appears that Plaintiffs have

alleged sufficient facts to state a claim for fiduciary breach based on Defendants' decision to charge excessive premiums. Thus, the Court denies Defendants' motion to dismiss as to Count Eleven.

### H.    Counts Twelve Through Fourteen

In Counts Twelve through Fourteen of the Second Amended Verified Complaint, Plaintiffs allege that Defendants violated § 104(b)(4) of ERISA by failing to fully respond to several information requests. Defendants first claim that Plaintiffs cannot name Defendants CNG and UI in these counts because they are not plan "administrators," and as such, they are not subject to the provisions of § 104(b)(4). Plaintiffs do not appear to dispute that only the plan administrator can be named in these counts, but they argue that they have alleged that CNG and UI are plan administrators (*see* 2d Am. Compl. ¶¶ 29–30), and therefore dismissal at this stage would be improper. Defendants do no more than argue that only the Committee is an administrator of the plan; they point to no deficiencies in Plaintiffs' allegations that would require the Court's conclusion that CNG and UI were not administrators as a matter of law. Furthermore, the Employee Benefits Handbook states that CNG is the plan sponsor and administrator. (*See* Employee Benefits Handbook at 126.) Thus, the Court will reserve judgment as to whether CNG and UI are plan administrators until the record can be more fully developed via discovery.

Defendants also argue that they have fully responded to Plaintiffs' document requests, and that even if they had not, Plaintiffs have failed to allege sufficient facts to show that the documents requested are subject to disclosure under § 104(b)(4).[5]

---

[5] As discussed above, Plaintiffs argue that the document requests and responses were not incorporate by reference in the Second Amended Verified Complaint and as

However, based on Plaintiffs' August 3, 2012 letter (*see* Document Requests, Ex. B to Defs.' Mem. Supp.), Plaintiffs appear to have been requesting additional documents even after Defendants' last correspondence with them on June 20, 2012 (*see id.* ("[P]lease provide me with the name of the plan applicable to active employees of CNG who are members of Local 12924, and the applicable plan documents and summary plan documents.")). Thus, Plaintiffs have alleged sufficient facts to establish that there are still document requests to which Defendants have not responded.

The Second Circuit has recognized that § 104(b)(4) creates only a limited disclosure requirement on the part of plan administrators. *See Bd. of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 147 (2d Cir. 1997) ("Congress intentionally fashioned § 104(b)(4) to limit the categories of documents that administrators must disclose on demand of plan participants[;] we think it inappropriate to infer an unlimited disclosure obligation on the basis of general provisions that say nothing about disclosure."). Specifically, § 104(b)(4) provides that a plan administrator must provide the "latest updated summary plan description, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." The Second Circuit has interpreted "other instruments" to mean "formal documents that govern the plan, not [] all documents by means of which the plan conducts operations." *Weinstein*, 107 F.3d at 143. Defendants object that none of the categories of documents requested by Plaintiffs fall into this category.

---

such, should not be considered by the Court in ruling on the motion to dismiss. Because the Second Amended Verified Complaint describes the specific letters and numbered document requests to which Defendants purportedly failed to respond, the Court will consider these documents in evaluating Defendants' motion to dismiss.

Specifically, Defendants claim that they were not required to provide calculation worksheets or outdated plan descriptions. *See Bilello v. JPMorgan Chase Retirement Plan*, 649 F. Supp. 2d 142, 169–70 (S.D.N.Y. 2009) ("A calculation worksheet is not a formal document governing a plan, but rather is an instrument by means of which the plan conducts operations. . . . Defendants [are] not . . . required to provide any SPDs besides the latest updated summary plan description." (internal citations and quotation marks omitted)); *see also Jackson v. E.J. Brach Corp.*, 937 F. Supp. 735, 739 (N.D. Il. 1996) ("We begin with plaintiffs' requests for out–dated documents, such as old SPDs, annual reports and modifications. We are not convinced that section 502(c) requires a plan administrator to provide such documents. . . . Outdated reports, summaries and modifications . . . do not fall into either category [of documents required to be produced]."). It would appear that any requests for calculation worksheets or outdated SPDs are not cognizable pursuant to § 104(b)(4). However, in *Bilello*, the district court held that the defendants were required to disclose any formal plan documents from the previous plan periods that were still being used to administer the plan in effect at the time that suit was filed. *See id.* at 170 ("The defendants' motion to dismiss Counts 10 and 11, therefore, is granted except for that portion of these claims which encompasses any formal plan documents from the period before 2002 which were still being used to operate the plan that was in effect in 2007.").

Thus, to the extent that Plaintiffs' claims in Counts Twelve to Fourteen refer to Defendants' failure to produce calculation worksheets or outdated SPDs, they are not actionable. However, without a full record of what was disclosed, the Court cannot determine whether Defendants fully complied with Plaintiffs' document requests with respect to any formal documents from previous plan periods that were being used to

administer the plan in effect in 2012.  Thus, with respect to these claims, the Court denies Defendants' motion to dismiss Counts Twelve, Thirteen, and Fourteen.

**III.     Conclusion**

For the foregoing reasons, Defendants' Motion [Doc. # 37] to Dismiss is GRANTED with respect to Counts One, Two, Three, Four, Five, Six, Nine, and Ten, and DENIED with respect to Counts Seven, Eight, and Eleven, and with respect to Counts Twelve, Thirteen, and Fourteen to the extent that they refer to Defendants' failure to provide formal documents from previous plan periods that were being used to administer the plan in 2012.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 14th day of June, 2013.